## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

|  |  |  |
|---|---|---|
| WACOM CO., LTD., | § | |
| | § | |
| | § | |
| v. | § | CASE NO. 2:24-CV-00702-JRG |
| | § | |
| SHENZHEN QIANFENYI | § | |
| INTELLIGENT TECHNOLOGY CO., | § | |
| LTD., | § | |
| | § | |

## CLAIM CONSTRUCTION
## MEMORANDUM AND ORDER

On January 28, 2026, the Court held a hearing to determine the proper construction of disputed terms in United States Patents No. 9,280,220, 9,690,399, 9,933,866, 9,977,519, 10,108,277, 10,437,356, and 10,768,720.

Before the Court is the Opening Claim Construction Brief (Dkt. No. 76) filed by Plaintiff Wacom Co., Ltd. ("Plaintiff" or "Wacom"). Also before the Court are the Responsive Claim Construction Brief (Dkt. No. 82) filed by Defendant Shenzhen Qianfenyi Intelligent Technology Co., Ltd. ("Defendant," also referred to by the parties as "Maxeye"), and Plaintiff's reply (Dkt. No. 86). Further before the Court are the parties' October 21, 2025 P.R. 4-3 Joint Claim Construction Statement (Dkt. No. 96) and the parties' December 30, 2025 Joint Claim Construction Chart (Dkt. No. 92).

Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing, having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Memorandum and Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

<u>Table of Contents</u>

**I. BACKGROUND** ................................................................................................. **2**

**II. LEGAL PRINCIPLES** ..................................................................................... **5**

**III. AGREED TERMS** ............................................................................................ **8**

**IV. DISPUTED TERMS IN U.S. PATENT NO. 9,280,220** ............................ **10**

    1. "A stylus comprising:" ................................................................................. 10

**V. DISPUTED TERMS IN U.S. PATENT NO. 9,977,519** ............................. **13**

    2. "An active pen, comprising:" ....................................................................... 13

    3. "a current beacon signal comprising an upstream packet specifying the pen ID, a timeslot, and a frequency" .................................................................. 16

    4. "a collision packet" ...................................................................................... 19

**VI. DISPUTED TERMS IN U.S. PATENT NO. 10,108,277** .......................... **21**

    5. "second position being off an axis of the pen-shaped position indicator" and "second position . . . off an axis of the pen-shaped position indicator" ........... 21

    6. "wherein the first and second electrodes are arranged at the first and second positions that are different along the axis of the pen-shaped position indicator" .............. 22

**VII. DISPUTED TERMS IN U.S. PATENT NO. 9,690,399** .......................... **24**

    7. "A signal decoding and modulation processing system for a capacitive stylus, comprising:" ........................................................................................... 24

    8. "a modulating module, configured to receive the feedback data from the micro controller unit and perform a modulation process accordingly so as to generate a differential binary phase shift keying (DBPSK) output signal, which is sent back to the touch panel" .......... 27

**VIII. DISPUTED TERMS IN U.S. PATENT NO. 9,933,866** ........................ **28**

    9. "A stylus, comprising:" ................................................................................ 28

    10. "high voltage" ............................................................................................. 30

    11. "a component operable to convert the voltage of approximately 1 to 3 volts to the high voltage" ............................................................................................. 37

**IX. DISPUTED TERMS IN U.S. PATENT NO. 10,768,720** .......................... **42**

    12. "An electronic pen, comprising:" ............................................................... 42

**X. CONCLUSION** ................................................................................................ **44**

## I. BACKGROUND

Plaintiff alleges infringement of United States Patents No. 9,280,220 ("the '220 patent"), 9,977,519 ("the '519 patent"), 10,108,277 ("the '277 patent"), 10,437,356 ("the '356 patent"), 9,690,399 ("the '399 patent"), 9,933,866 ("the '866 patent"), and 10,768,720 ("the '720 patent").

(Dkt. No. 76, Exs. A–G.)  Plaintiff submits that "[a]ll of the asserted patents relate to styluses – pen-shaped devices that are used with touchscreens on devices such as computer tablets."  (Dkt. No. 76, at 1.)

The '220 Patent, titled "Pulse- or Frame-Based Communication Using Active Stylus," issued on March 8, 2016, and bears an earliest priority date of October 28, 2011.  The Abstract of the '220 Patent states:

> In one embodiment, a method includes receiving sensor data from one or more sensors in or on a stylus, the stylus including one or more electrodes and one or more computer-readable non-transitory storage media embodying logic for wirelessly transmitting signals to a device through a touch sensor of the device. The method includes generating a carrier signal and modulating the carrier signal to communicate the sensor data and wirelessly transmitting from the stylus to the device the carrier signal as modulated through the touch sensor of the device.

The '519 Patent, titled "Active Pen With Bidirectional Communication," issued on May 22, 2018, and bears an earliest priority date of February 25, 2015.  The Abstract of the '519 Patent states:

> A processing system for an input device, the processing system including: a sensor module coupled to sensor circuitry and configured to: initiate a current beacon period including a plurality of timeslots by broadcasting a current beacon signal to a plurality of active pens; receive, during a first timeslot, a first downstream packet from a first active pen transceiver; and receive, during a second timeslot, a second downstream packet from a second active pen transceiver, and a determination module configured to: determine an attribute of a first active pen including the first active pen transceiver from at least the first downstream packet.

The '277 Patent, titled "Pointer, Position Detection Apparatus and Position Detection Method," issued on October 23, 2018, and bears an earliest priority date of February 5, 2010.  The Abstract of the '277 Patent states:

> A position detection apparatus of the electrostatic coupling type is provided, to detect not only a position of a pointer but also information other than the position information such as, for example, pointer pressure or side switch information. The pointer transmits two codes such that a pressure applied to a pen tip is associated with a time difference between the two codes. A position detector carries out a

- 3 -

correlation matching operation between signals generated in reception conductors and correlation calculation codes corresponding to the two codes, to thereby detect a position on a sensor section pointed to by the pointer from a result of the correlation matching operation and based on at least one of the codes. The position detector further includes a pressure calculation circuit for detecting pressure applied to the pointer, which is associated with the time difference between the two codes, from the result of the correlation matching operation calculated by the correlation matching operation and based on the two codes.

The '356 Patent, titled "Timing Synchronization of Active Stylus and Touch Sensor," issued on October 8, 2019, and bears an earliest priority date of May 12, 2014. The Abstract of the '356 Patent states:

In one embodiment, a computer-readable non-transitory storage medium embodies logic that is configured when executed to determine a first correlation between first consecutive edges of a synchronization signal and a pre-determined coefficient vector. The logic is further configured when executed to determine a second correlation between second consecutive edges of the synchronization signal and the pre-determined coefficient vector and synchronize one or more timings for communication between a stylus and a device based at least in part on the first and second correlations.

The '399 Patent, titled "Signal Decoding and Modulation Processing System for Capacitive Stylus," issued on June 27, 2017, and bears an earliest priority date of October 16, 2015. The Abstract of the '399 Patent states:

A signal decoding and modulation processing system for capacitive stylus is disclosed. The system includes a micro controller unit (MCU) and a digital processing unit. The digital processing unit is electrically connected to the MCU. The digital processing unit includes a decoding module and a modulating module. The decoding module is configured to decode an input signal from a touch panel, so as to generate a decoded input content. Then, the MCU generates a feed back data according to the decoded input content. The modulating module receives the feedback data from the MCU and performs a modulation process accordingly for generating a differential binary phase shift keying (DBPSK) output signal, which is sent back to the touch panel.

The '866 Patent, titled "Active Stylus With High Voltage," issued on April 3, 2018, and bears an earliest priority date of October 28, 2011. The Abstract of the '866 Patent states:

In certain embodiments, a stylus includes one or more electrodes and one or more computer-readable non-transitory storage media embodying logic for transmitting signals wirelessly to a device through a touch sensor of the device. At least some of the signals are high-voltage signals generated by a relatively large potential difference compared to a voltage within a voltage range of approximately 1 to approximately 3 volts. The stylus includes a stylus tip, and one or more of the one or more electrodes are disposed at the stylus tip.

The '720 Patent, titled "Electronic Pen," issued on September 8, 2020, and bears an earliest priority date of May 24, 2017. The Abstract of the '720 Patent states:

A work step of electrical connection between a writing pressure detector and a circuit element of a circuit is reduced. An electronic pen includes a writing pressure detector that detects a pressure applied to a core body disposed on one end side of a tubular chassis in the axial center direction, a circuit board for which a flexible substrate formed into a shape allowed to extend in the axial center direction is used in the chassis, and a holder housed in the chassis in such a manner as to hold the writing pressure detector and the circuit board and extend in the axial center direction. In the circuit board, a writing pressure detector placement part, a circuit placement part at which a predetermined circuit is formed, and a line part at which a line pattern that electrically connects a component of the writing pressure detector placed on the writing pressure detector placement part and a circuit element of the circuit placement part is formed are formed to line up in the axial center direction. The writing pressure detector placement part of the circuit board is held by the holder in the state of being along a direction perpendicular to the axial center direction in such a manner that the writing pressure detector can receive a pressure in the axial center direction applied to the core body through bending of the flexible substrate at a part of the line part.

## II. LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the

meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841 (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a

disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Technical dictionaries and treatises may help a

court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134 S. Ct. 2120. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III.  AGREED TERMS

In their October 21, 2025 P.R. 4-3 Joint Claim Construction Statement and in their December 30, 2025 P.R. 4-5(d) Joint Claim Construction Chart (Dkt. No. 58, at 1–2; Dkt. No. 92, App'x A, at 4–9 & 16–18), the parties submitted the following agreed-upon constructions:

| Term | Agreed Construction |
|------|---------------------|
| "A pen-shaped position indicator configured to capacitively couple with a sensor surface, the pen-shaped position indicator comprising:"<br><br>('277 Patent, Claim 1) | The preamble is a limitation of the claim. |
| "A method of detecting angle information of a pen-shaped position indicator, the method comprising:"<br><br>('277 Patent, Claim 14) | The preamble is a limitation of the claim. |
| "A stylus, which communicates data to a touch-sensor controller, the stylus comprising:"<br><br>('356 Patent, Claim 1) | The preamble is a limitation of the claim. |
| "A controller integrated circuit configured to control a stylus, wherein the stylus communicates data to a touch-sensor controller and the stylus includes a tip and one or more electrodes included in the tip, the controller integrated circuit comprising:"<br><br>('356 Patent, Claim 18) | The preamble is a limitation of the claim. |
| "A system including a stylus and a sensor controller, wherein, the sensor controller is coupled to a touch sensor and is configured to transmit synchronization signals defined by a wide-band code via the touch sensor, and wherein the stylus is configured to communicate data to the sensor controller, the stylus comprising:"<br><br>('356 Patent, Claim 22) | The preamble is a limitation of the claim. |
| "A method of manufacturing a circuit board for an electronic pen, the method comprising:"<br><br>('720 Patent, Claim 19) | The preamble is a limitation of the claim. |

## IV.  DISPUTED TERMS IN U.S. PATENT NO. 9,280,220

**1.  "A stylus comprising:"**

| **"A stylus comprising:"** ('220 Patent, Claim 1) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| The preamble is a limitation of the claim. | The preamble is not limiting. |

(Dkt. No. 58, Ex. A, at 1; Dkt. No. 92, App'x A, at 1.)

<u>(a)  The Parties' Positions</u>

Plaintiff argues that the preamble is limiting because "stylus" recites essential structure. (Dkt. No. 76, at 2.)  Plaintiff also argues that the Title, Abstract, and specification repeatedly frame the invention as improvements to an "active stylus," and "[t]he patent does not suggest that the invention be implemented in any system other than one involving a stylus communicating with a touchscreen."  (*Id.*, at 2–3.)

Defendant responds that preambles are generally not limiting and that, here, the body of the claim is structurally complete such that the preamble adds nothing to the configuration of the claimed device.  (Dkt. No. 82, at 28.)  Defendant argues that "a stylus" was conventional and is not referenced in the body for antecedent basis, which distinguishes the preamble of Claim 1 of the '356 Patent that the parties have agreed is limiting.  (*Id.*, at 28–29.)

Plaintiff replies: "Maxeye also incorrectly focuses on whether the preambles recite 'a conventional use in the prior art.'  Dkt. 82, at 28.  The issue here is not the intended use of the inventions, but whether the preambles recite necessary structure."  (Dkt. No. 86, at 10.)

At the January 28, 2026 hearing, Plaintiff argued that the preamble is limiting because the claim recites an improvement to a stylus.  Plaintiff also argued that understanding the relationships

between the recited components requires understanding that the components are part of a stylus. Defendant responded, for example, that the specification refers to an "object," not necessarily a stylus, that touches a screen. *See, e.g.*, '220 Patent at 1:18–21.

(b)  Analysis

> In general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim. *Pitney Bowes[, Inc. v. Hewlett-Packard Co.*], 182 F.3d [1298,] 1305 [(Fed. Cir. 1999)]. Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.' *Rowe v. Dror*, 112 F.3d 473, 478, 42 USPQ2d 1550, 1553 (Fed. Cir. 1997).

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).

"When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention." *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003).

In some cases, a preamble may also be limiting if it states a "fundamental characteristic of the claimed invention," "serves to focus the reader on the invention that is being claimed," or "states the framework of the invention." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006).   Also, a preamble may be limiting if it sets forth a feature "underscored as important by the specification." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012) (quoting *Catalina*, 289 F.3d at 808).

Nonetheless, "the purpose or intended use of the invention . . . is of no significance to claim construction . . . ." *See Pitney Bowes*, 182 F.3d at 1305.

Claim 1 of the '220 Patent recites (emphasis added):

1.  *A stylus comprising:*
   one or more sensors;
   one or more electrodes configured to communicate with a device by receiving signals from and transmitting signals to a touch sensor of the device; and

> one or more computer-readable non-transitory storage media embodying logic that is operable when executed to:
>> receive sensor data from the one or more sensors;
>> receive a first signal generated by the device;
>> generate a second signal by modulating a carrier signal based on the sensor data; and
>> transmit to the device, in response to the first signal, the second signal, the sensor data being obtainable by demodulating the second signal.

Plaintiff emphasizes that the Title, Abstract, and specification repeatedly refer to a stylus. (Dkt. No. 76, at 2 (citing '220 Patent at 6:20–10:9, 10:61–12:2, 12:3–13:50, 13:51–14:15 & 14:16–15:33; *see also id.* at Figs. 2–4, 7A, & 7B).)  In this regard, Plaintiff cites *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004) ("The specification is replete with references to the invention as a 'blown-film' liner, including the title of the patent itself and the 'Summary of the Invention.'"; "[T]he phrase is used repeatedly to describe the preferred embodiments . . . .").  Plaintiff also cites *MEMS Tech. Berhad v. Int'l Trade Comm'n*, No. 2010–1018, 447 F. App'x 142, 153–54 (Fed. Cir. June 3, 2011) (preamble recital of "microelectromechanical system package" found limiting; "the essence of the invention claimed . . . is the containment of the components in a 'package,'" and "the bodies of [the] claims . . . do not require that the listed components come together in this way to constitute a package").

Even though the Title and the Abstract, as well as several disclosed embodiments, refer to a stylus, nothing in the body of the claim recites a stylus, and the limitations in the body of the claim can be readily understood without necessarily being limited to a stylus.  The preamble recital of a "stylus" is an intended use, not a limitation.  *See Pitney Bowes*, 182 F.3d at 1305 (quoted above); *see, e.g., Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1236 (Fed. Cir. 2017) (citing *Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002)).

The Court therefore hereby finds that **the preamble of Claim 1 of the '220 Patent is not limiting.**

## V.  DISPUTED TERMS IN U.S. PATENT NO. 9,977,519

**2.  "An active pen, comprising:"**

| **"An active pen, comprising:"** ('519 Patent, Claim 20) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| The preamble is a limitation of the claim. | The preamble is not limiting. |

(Dkt. No. 58, Ex. A, at 1; Dkt. No. 92, App'x A, at 2.)

(a)  The Parties' Positions

Plaintiff argues that "[t]he term 'active pen' in claim 20 recites an essential structure of the invention, and is also necessary to give life, meaning, and vitality to the claim."  (Dkt. No. 76, at 4.)  Plaintiff also argues:

> As described in the specification, the purpose of the pen ID is to provide a means for identifying a pen so that data can be targeted to *that particular pen*. *See id.* at 8:12–15, 9:23–29. It would make no sense for claim 20 to cover anything other than the "active pen" mentioned in the preamble when the claim requires that the claimed apparatus have a "pen identification (ID)."

(*Id.*, at 4.)  Further, Plaintiff highlights that "[a]n active pen" in the preamble provides antecedent basis for "the active pen" in dependent Claims 21 and 23.  (*Id.*, at 4–5.)  Finally, Plaintiff argues that "the preamble of claim 20 does not merely state a purpose or intended use for the invention," "[r]ather, the term 'active pen' indicates the overall structure of the invention, and therefore necessarily limits the claim."  (*Id.*, at 6 (citation omitted).)

Defendant argues the claim body is structurally complete and that "active pen" reflects a conventional device in the prior art and does not add structural limitations to the claim.  (Dkt. No.

82, at 28.)  Defendant argues that Plaintiff's reliance on agreed-limiting preambles in other patents is inapposite because those preambles provide antecedent basis.  (*Id.*, at 29.)  Further, Defendant submits that "Wacom has not provided any authority for the proposition that the preamble of an independent claim is limiting solely because it provides antecedent basis for a later dependent claim."  (*Id.*)

Plaintiff replies that Defendant "does not address how '519 claim 20 could cover anything other than an 'active pen' when the body of the claim specifically requires the claimed device to include a 'pen ID' . . . ."  (Dkt. No. 86, at 10.)

At the January 28, 2026 hearing, Plaintiff emphasized its argument that the recital of "a pen identification (ID)" in the body of the claim is an identification of the "active pen" recited in the preamble.  Defendant responded that to whatever extent the recital of a "pen ID" requires an active pen, that is part of the "pen ID" limitation and does not rely on the preamble.

(b)  Analysis

Legal principles regarding preambles are set forth as to the term "A stylus comprising" (addressed above).

Here, Claim 20 of the '519 Patent recites (emphasis added):

20.  *An active pen, comprising:*
an identification (ID) register storing a *pen identification (ID)*;
a button; and
a transceiver configured to:
receive, from a first input device, a current beacon signal comprising an upstream packet specifying the *pen ID*, a timeslot, and a frequency,
wherein the current beacon signal initiates a current beacon period comprising a plurality of timeslots; and
transmit, to the first input device and during the timeslot specified in the upstream packet, a downstream packet comprising a status of the button using the frequency specified in the upstream packet.

- 14 -

The recitals of a "pen identification (ID)" do not rely upon the preamble for antecedent basis, but it is noteworthy that these recitals use a word, "pen," that appears also in the preamble. Moreover, dependent Claims 21 and 23 recite:

> 21. The active pen of claim 20, wherein the transceiver is further configured to:
> receive, before receiving the current beacon signal, a prior beacon from the first input device,
> wherein the prior beacon signal initiates a prior beacon period, and
> wherein *the active pen* is unpaired for at least a portion of the prior beacon period; and
> send, in response to the prior beacon, an acknowledgment to trigger pairing with the first input device.
>
> * * *
>
> 23. The active pen, of claim 21, further comprising:
> a determination module configured to:
> detect a missing beacon from the first input device; and
> set the ID register to zero in response to the missing beacon to unpair
> *the active pen*.

This explicit reliance on the preamble by the dependent claims, particularly when coupled with the references to "pen identification (ID)" in the independent claim, warrants finding the preamble limiting. *See Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015) (preamble of independent claim found to be limiting because, among other factors, the preamble provided antecedent basis for a term in a dependent claim). Although *Pacing Technologies* did not set forth a bright-line rule regarding preambles that provide antecedent basis for dependent claims, this authority is particularly compelling when considering also the references to "pen identification (ID)" in the independent claim.

The Court accordingly hereby finds that **the preamble of Claim 20 of the '519 Patent is limiting**.

### 3. "a current beacon signal comprising an upstream packet specifying the pen ID, a timeslot, and a frequency"

| "a current beacon signal comprising an upstream packet specifying the pen ID, a timeslot, and a frequency" ('519 Patent, Claim 20) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| "one or more current beacon signals that includes at least one upstream packet and that specifies the pen ID, a timeslot, and a frequency"<br><br>Alternatively:<br>　"one or more current beacon signals that includes one or more upstream packets specifying the pen ID, a timeslot, and a frequency" | No construction necessary; plain and ordinary meaning |

(Dkt. No. 58, Ex. A, at 2; Dkt. No. 86, at 3; Dkt. No. 92, App'x A, at 2.)

(a) The Parties' Positions

Plaintiff argues that, in an open-ended "comprising" claim such as this, "a" means one or more, and "consistent with this rule, 'a current beacon signal' should be construed as 'one or more current beacon signals,' and 'an upstream packet' should be construed as 'at least one upstream packet.'" (Dkt. No. 76, at 6.) Plaintiff also argues that "a POSITA reading the '519 specification would understand that the pen ID, timeslot, and frequency information sent from the input device to the active pen could be transmitted through one or more beacon signals and one or more upstream packets." (Id., at 7 (citation omitted).) Plaintiff urges that its proposed construction "is important to clarify that the claim does not narrowly require a single beacon signal that includes only one upstream packet that specifies the pen ID, timeslot, and frequency." (Id., at 8.)

Defendant responds: "There is no dispute that 'a current beacon signal' means 'one or more current beacon signals.' Nor is there a dispute that 'an upstream packet' means 'one or more

upstream packets.'  However, Wacom's proposed construction goes too far by changing the requirements of that (one or more) upstream packet(s) and introducing unnecessary ambiguity." (Dkt. No. 82, at 2 (footnote omitted).)  Defendant also argues that "when the inventors wanted an embodiment to cover sending information in 'one or more upstream data packets,' they said so." (*Id.*, at 4.)  Alternatively, Defendant submits:

> If, on the other hand, the Court determines that a construction is necessary, the construction should provide that a single upstream packet specifies the pen ID, a timeslot, and a frequency. There could be more than one upstream packet, each capable of specifying a pen ID, a timeslot, and a frequency, but claim 20 does not allow for distributing the required specification across multiple different upstream packets.

(*Id.*, at 6 (citation omitted).)

Plaintiff replies that "[c]ontrary to Maxeye's argument, the '519 specification does not require that a single upstream packet contain all three of the pen ID, timeslot, and frequency information." (Dkt. No. 86, at 1.)  Plaintiff also submits:

> Finally, Maxeye argues that Wacom's use of the "and that specifies" language in its proposed construction creates potential confusion because it suggests that the beacon signal rather than the upstream packet is specifying the pen ID, timeslot, and frequency. To address Maxeye's concern, never previously stated, Wacom proposes to modify its proposed construction to "one or more current beacon signals that includes one or more upstream packets specifying the pen ID, a timeslot, and a frequency." This modification also addresses Maxeye's concern regarding the "at least one" language in Wacom's previous proposed construction. *See* Dkt. 82 at 2 n.1.

(Dkt. No. 86, at 3.)

At the January 28, 2026 hearing, Plaintiff maintained its position that pen ID, timeslot, and frequency could be distributed among multiple packets.  Defendant maintained that no construction is necessary but stated it would be amenable to a construction expressly requiring at least one packet specifying all three of pen ID, timeslot, and frequency.

- 17 -

(b)  Analysis

Claim 20 of the '519 Patent recites (emphasis added):

20.  An active pen, comprising:
 an identification (ID) register storing a pen identification (ID);
 a button; and
 a transceiver configured to:
  receive, from a first input device, *a current beacon signal comprising an upstream packet specifying the pen ID, a timeslot, and a frequency,*
  wherein the current beacon signal initiates a current beacon period comprising a plurality of timeslots; and
  transmit, to the first input device and during the timeslot specified in the upstream packet, a downstream packet comprising a status of the button using the frequency specified in the upstream packet.

The recital of "a current beacon signal comprising" refers to what a particular current beacon signal comprises, and the recital of "an upstream packet specifying" refers to what a particular upstream packet specifies; this is true even though the indefinite article, "a," encompasses "one or more." *See In re Varma*, 816 F.3d 1352, 1363 (Fed. Cir. 2016) ("For a dog owner to have 'a dog that rolls over and fetches sticks,' it does not suffice that he have two dogs, each able to perform just one of the tasks."); *see also Salazar v. AT&T Mobility LLC*, 64 F.4th 1311, 1317 (Fed. Cir. 2023) ("We agree with the district court that while the claim term 'a microprocessor' does not require there be only one microprocessor, the subsequent limitations referring back to 'said microprocessor' require that at least one microprocessor be capable of performing each of the claimed functions.  This approach is entirely consistent with our precedent."); *id.* at 1315–18.  The specification disclosures cited by Plaintiff do not demonstrate otherwise.  '519 Patent at 9:23–37 & 11:61–67.  The opinions of Plaintiff's expert are likewise unpersuasive.  Dkt. No. 76, Ex. H, Oct. 21, 2025 Nettles Decl. ¶¶ 37–38.

The Court therefore hereby construes "a current beacon signal comprising an upstream packet specifying the pen ID, a timeslot, and a frequency" to mean **"a current beacon signal comprising one or more upstream packets, wherein at least one of the upstream packets specifies all three of the following: the pen ID, a timeslot, and a frequency."**

### 4.  "a collision packet"

| "a collision packet"<br>('519 Patent, Claim 22) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| "one or more packets that indicates a collision" | No construction necessary; plain and ordinary meaning. |

(Dkt. No. 58, Ex. A, at 2; Dkt. No. 92, App'x A, at 3.)

<u>(a)  The Parties' Positions</u>

Plaintiff argues that construction is necessary because whereas a finder of fact might read this term as referring to a packet colliding with another packet, here the term "collision packet" refers to a packet that indicates a collision.  (Dkt. No. 76, at 9.)  Plaintiff cites disclosure in the specification that a "collision packet" causes pens to unpair and causes each pen to wait a random length of time before re-attempting to pair.  (*Id.* (citing '519 Patent at 12:14–44).)

Defendant argues that Plaintiff's concern is "hypothetical" and "is unimportant for understanding the meaning of claim 22 and possible infringement or invalidity" because Claim 22 is focused on what the transceiver does with the 'collision packet,' not the contents of the collision packet itself."  (Dkt. No. 82, at 7.)

Plaintiff replies that "'collision packet' is not a commonly understood term in telecommunications" and that "as described in the '519 specification, 'collision packet' refers to a

specific type of packet that is sent out to report the occurrence of a collision." (Dkt. No. 86, at 3.) (citations omitted).)

At the January 28, 2026 hearing, Defendant reiterated that this term is readily understandable and that no construction is necessary. Plaintiff urged that a construction would be helpful because this term is being used in a technical manner that might be counter-intuitive to a finder of fact.

(b) Analysis

Claim 22 of the '519 Patent recites (emphasis added):

22. The active pen of claim 21, wherein the transceiver is further configured to:
    receive, from the first input device, *a collision packet*;
    wait a random time interval in response to the collision packet; and
    re-attempt pairing with the first input device after the random time interval.

The specification discloses:

In one or more embodiments of the invention, multiple unpaired active pens exist within the range of the processing system (110). In other, the multiple unpaired active pens may receive the beacon signal broadcasted by the sensor module (160). A collision may exist if two (or more) unpaired active pens attempt to pair with the processing system (110) at the same time (i.e., each of the unpaired active pens sends an ACK) in response to a beacon signal. In one or more embodiments, the determination module (150) is configured to detect a collision between the multiple active pens. Moreover, the determination module (150) may generate a *collision packet* that is sent by the sensor module (160) to the multiple unpaired active pens. In some embodiments, the collision packet may be sent to all pens, as it may be unknown how many pens are paired and unpaired. *In response to receiving the collection* [sic] *packets, each of the unpaired active pens may wait a random time interval (e.g., a random number of beacon periods) before re-attempting to pair with the processing system (110).* In other words, the unpaired active pens might not send any acknowledgement to any received beacon signal during the random time interval.

In one or more embodiments of the invention, there may be a collision between two or more paired active pens (140). Collisions may be detected by noting that responses are being received at the same timeslot and frequency, but at different locations (either in X or Y or both). In this case, *the sensor module may broadcast a collision packet to these paired active pens. In response, the active pens would*

- 20 -

> *un-pair, wait for a random number of sensor beacons, and try and reestablish communication.*

'519 Patent at 12:14–44 (emphasis added).

Plaintiff's proposed construction is consistent with this disclosure and will assist the finder of fact in understanding the claim.  At the January 28, 2026 hearing, Defendant expressed no substantive objection to Plaintiff's proposed construction.

The Court therefore hereby construes "collision packet" to mean **"one or more packets that indicate a collision."**

## VI.  DISPUTED TERMS IN U.S. PATENT NO. 10,108,277

**5.  "second position being off an axis of the pen-shaped position indicator" and "second position . . . off an axis of the pen-shaped position indicator"**

| **"second position being off an axis of the pen-shaped position indicator"**<br>**"second position . . . off an axis of the pen-shaped position indicator"**<br>('277 Patent, Claims 1, 14) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| "second position surrounding the axis of the position indicator" | No construction necessary; plain and ordinary meaning |

(Dkt. No. 58, Ex. A, at 2–3.)

In its reply brief, Plaintiff states that "[t]o narrow the disputed issues, Wacom hereby withdraws its proposed construction for this limitation, and agrees with Maxeye that no construction is necessary for this limitation."  (Dkt. No. 86, at 3.)  Also, this term does not appear as a disputed term in the parties' December 30, 2025 P.R. 4-5(d) Joint Claim Construction Chart. (*See* Dkt. No. 92, App'x A.)

Because this term is no longer in dispute, the Court does not further address this term.

**6.  "wherein the first and second electrodes are arranged at the first and second positions that are different along the axis of the pen-shaped position indicator"**

| "wherein the first and second electrodes are arranged at the first and second positions that are different along the axis of the pen-shaped position indicator" ('277 Patent, Claims 2, 15) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Not indefinite. Plain and ordinary meaning. | Indefinite. |

(Dkt. No. 58, Ex. A at 3–4; Dkt. No. 92, App'x A, at 6.)

(a)  The Parties' Positions

Plaintiff argues that, based on the specification, "[a] POSITA would . . . understand that 'along the axis of the pen-shaped position indicator' refers to a direction that is parallel to the axis," and the disputed term means that "as one is comparing the positions of the first and second electrodes along the axis of the pen-shaped position indicator, those positions are different."  (Dkt. No. 76, at 14.)

Defendant responds:

Independent claims 1 and 14 require the second electrode to be "*off* [the] axis." Dependent claims 2 and 15 of the '277 patent require that the "second electrode" introduced in claims 1 and 14 be specifically positioned "*along* the axis of the pen-shaped position indicator." These two terms are contradictory: a single electrode cannot simultaneously be both "off" and "along" an axis. Claims that are internally contradictory are invalid as indefinite.

(Dkt. No. 82, at 11 (citations omitted).)

Plaintiff replies that "'along the axis' is the perspective from which one determines whether the positions of the first and second electrodes are 'different,'" and "[i]t does not mean that the first and second electrodes must be 'on' the axis, which is Maxeye's apparent reading."  (Dkt. No. 86, at 4 (citation omitted).)

At the January 28, 2026 hearing, Defendant argued that Plaintiff's argument fails because Plaintiff's reading of "along the axis" as meaning "on the axis" is incorrect.

(b)  Analysis

Claim 2 of the '277 Patent, for example, depends from Claim 1, and Claims 1 and 2 recite (emphasis added; formatting modified):

> 1.  A pen-shaped position indicator configured to capacitively couple with a sensor surface, the pen-shaped position indicator comprising:
> a pen-shaped body having a pen-tip portion;
> a first electrode arranged at a first position of the pen-tip portion;
> a second electrode arranged at a second position of the pen-tip portion different from the first position, the *second position being off an axis of the pen-shaped position indicator*;
> a signal production circuit configured to generate first and second signals that are distinguishable from each other; and
> conductive lines extending between the signal production circuit and the first and second electrodes, respectively,
> wherein the first and second signals generated by the signal production circuit, in operation, are transmitted to the first and second electrodes via the conductive lines;
> wherein the first and second electrodes are configured to form first and second capacitive relationships with the sensor surface, respectively, to generate detection signals in the sensor surface based on which angle information of the pen-shaped position indicator is obtainable.
>
> 2.  The pen-shaped position indicator according to claim 1, wherein the first and second electrodes are arranged at the first and second positions that are *different along the axis* of the pen-shaped position indicator.

The specification discloses, for example:

> Further, in order to detect information other than the position information, such as the rotational position, where the pointer is rotated around a pen tip (axis) thereof on a position detector, or the inclination of the pointer, a plurality of electrode pieces divided electrically from each other are disposed around the central axis of the pointer on the pointer, and codes of different types are supplied respectively to the plurality of electrode pieces.

'277 Patent at 2:38–45.

Defendant argues that Claim 2 is internally inconsistent because dependent Claim 2 includes the limitation of Claim 1 of "the second position being *off an axis* of the pen-shaped position indicator." *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1366–67 (Fed. Cir. 2016); *see also Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1362 (Fed. Cir. 2016).

Claim 2, however, merely recites that the "differen[ce]" between the first and second positions is the difference as measured along the direction of the axis of the pen-shaped position indicator. This does not require the positions to be *on* the axis of the pen-shaped position indicator. The opinion of Plaintiff's expert is further persuasive in this regard. *See* Dkt. No. 76, Ex. H, Oct. 21, 2025 Nettles Decl. ¶¶ 45. The same analysis applies to the other claim here at issue, namely Claim 15.

The Court therefore hereby expressly rejects Defendant's indefiniteness argument. Defendant presents no alternative proposed construction, and no further construction is necessary.

The Court accordingly hereby construes "wherein the first and second electrodes are arranged at the first and second positions that are different along the axis of the pen-shaped position indicator" to have its **plain meaning**.

## VII. DISPUTED TERMS IN U.S. PATENT NO. 9,690,399

### 7. "A signal decoding and modulation processing system for a capacitive stylus, comprising:"

| "A signal decoding and modulation processing system for a capacitive stylus, comprising:" ('399 Patent, Claim 1) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| The preamble is a limitation of the claim. | The preamble is not limiting. |

(Dkt. No. 58, Ex. A, at 4–5; Dkt. No. 92, App'x A, at 10.)

- 24 -

<u>(a)  The Parties' Positions</u>

Plaintiff argues that "all figures and embodiments described in the '399 patent are specific to a capacitive stylus," and "[a]s such, the location of the elements of the patent claim within the structure of a capacitive stylus is a key part of the patented invention, and thus the preamble should be found limiting."  (Dkt. No. 76, at 16–17 (citations omitted).)

Defendant responds that preambles are generally not limiting and that, here, the body of the claim is structurally complete such that the preamble adds nothing to the configuration of the claimed device.  (Dkt. No. 82, at 28–29.)  Defendant argues that "a capacitive stylus" was conventional and is not referenced in the body for antecedent basis, which distinguishes the preamble of Claim 1 of the '356 Patent that the parties have agreed is limiting.  (*Id.*, at 29.)

Plaintiff replies: "Maxeye also incorrectly focuses on whether the preambles recite 'a conventional use in the prior art.'  Dkt. 82, at 28.  The issue here is not the intended use of the inventions, but whether the preambles recite necessary structure."  (Dkt. No. 86, at 10.)

At the January 28, 2026 hearing, Plaintiff argued that the preamble is limiting because the claim is directed to an improvement to a capacitive stylus.  Defendant responded that this claim is directed to software, arguing that although the software may be intended to be used in a capacitive stylus, the claim does not limit the software to being used in a capacitive stylus.

<u>(b)  Analysis</u>

Claim 1 of the '399 Patent recites (emphasis added; formatting modified):

1. *A signal decoding and modulation processing system for a capacitive stylus, comprising:*
    a micro controller unit; and
    a digital processing unit, electrically connected with the micro controller unit, wherein the digital processing unit comprises:
    a decoding module, configured to decode an input signal from a touch panel so as to correspondingly generate a decoded input content, and the decoded input

content is transmitted to the micro controller unit, wherein the micro controller unit generates a feedback data according to the decoded input content; and

a modulating module, configured to receive the feedback data from the micro controller unit and perform a modulation process accordingly so as to generate a differential binary phase shift keying (DBPSK) output signal, which is sent back to the touch panel;

wherein the decoding module comprises:

a shift register, configured to receive the input signal from the input of the decoding module, and receive a clock signal from the micro controller unit; and

a direct sequence spread spectrum (DSSS) code, wherein the shift register performs XOR operation and summation operation with the DSSS code, in order to correspondingly generate an operation result.

Much like for Claim 1 of the '220 Patent, nothing in the body of the claim recites a capacitive stylus, and the body of the claim explicitly recites "a decoding module" and "a modulating module" without any apparent reliance on the preamble recital of "[a] signal decoding and modulation processing system." Also, the limitations in the body of the claim can be readily understood without necessarily being limited to a capacitive stylus. The specification disclosures cited by Plaintiff do not override the claim language. *See* '399 Patent at 1:23–25, 1:35–40, 1:53–55 & 2:24–30; *see also Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (noting the "primacy of the claim language during claim construction, as outlined in *Phillips*"). The preamble recital of a "capacitive stylus" is an intended use, not a limitation. *See Pitney Bowes*, 182 F.3d at 1305 (quoted above); *see, e.g., Georgetown Rail*, 867 F.3d at 1236 (citing *Allen Eng'g*, 299 F.3d at 1346).

The Court therefore hereby finds that **the preamble of Claim 1 of the '399 Patent is not limiting**.

**8. "a modulating module, configured to receive the feedback data from the micro controller unit and perform a modulation process accordingly so as to generate a differential binary phase shift keying (DBPSK) output signal, which is sent back to the touch panel"**

| "a modulating module, configured to receive the feedback data from the micro controller unit and perform a modulation process accordingly so as to generate a differential binary phase shift keying (DBPSK) output signal, which is sent back to the touch panel" ('399 Patent, Claim 1) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Not a means-plus-function limitation. | Function: |
| | "receive the feedback data from the micro controller unit and perform a modulation process accordingly so as to generate a differential binary phase shift keying (DBPSK) output signal, which is sent back to the touch panel" |
| However, if the Court construes as a means-plus-function limitation, then the function and corresponding structure is: | |
| Function: | Structure: |
| "receive the feedback data from the micro controller unit and perform a modulation process to generate a differential binary phase shift keying (DBPSK) output signal" | "a serial interface, configured to buffer and receive the feedback data, electrically connected with a multiplexer, an inverter electrically connected with the multiplexer, and a fractional-N frequency divider electrically connected with the multiplexer and the inverter" |
| Structure: | |
| "a serial interface, multiplexer, inverter, and fractional-N frequency divider, and equivalents thereof" | |

(Dkt. No. 58, Ex. A, at 5.)

In its response brief, Defendant withdraws its means-plus-function proposal and instead proposes that the Court should give the term its plain and ordinary meaning. (Dkt. No. 82, at 12–13.) Also, this term does not appear as a disputed term in the parties' December 30, 2025 P.R. 4-5(d) Joint Claim Construction Chart. (*See* Dkt. No. 92, App'x A.)

This term is therefore no longer in dispute, and the Court accordingly does not further address this term.

## VIII.  DISPUTED TERMS IN U.S. PATENT NO. 9,933,866

**9.  "A stylus, comprising:"**

| **"A stylus, comprising:"**<br>('866 Patent, Claim 1) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| The preamble is a limitation of the claim. | The preamble is not limiting. |

(Dkt. No. 58, Ex. A, at 6; Dkt. No. 92, App'x A, at 11.)

<u>(a)  The Parties' Positions</u>

Plaintiff argues that "[l]ike the other asserted patents, it is clear from the claim language and the specification that the elements of the claims of the '866 patent are specific to, and located in, a stylus device."  (Dkt. No. 76, at 20.)

Defendant responds that preambles are generally not limiting and that, here, the body of the claim is structurally complete such that the preamble adds nothing to the configuration of the claimed device.  (Dkt. No. 82, at 28–29.)  Defendant argues that a "stylus" was conventional and is not referenced in the body for antecedent basis, which distinguishes the preamble of Claim 1 of the '356 Patent that the parties have agreed is limiting.  (*Id.*)

Plaintiff replies that Defendant does not address "how '866 claim 1 could cover anything other than a 'stylus' when the body of the claim requires the claimed device to include a 'stylus tip.'"  (Dkt. No. 86, at 10.)

<u>(b)  Analysis</u>

Claim 1 of the '866 Patent recites (emphasis added):

1.  *A stylus comprising:*
> one or more electrodes;
> one or more computer-readable non-transitory storage media embodying logic for transmitting signals wirelessly to a device through a touch sensor of the

device, at least some of the signals comprising high-voltage signals associated with a high voltage comprising a relatively large potential difference compared to a voltage within a voltage range of approximately 1 to approximately 3 volts;

a component operable to convert the voltage of approximately 1 to 3 volts to the high voltage; and

*a stylus tip*, one or more of the one or more electrodes being disposed at the stylus tip;

wherein the high-voltage signals result from the one or more electrodes receiving the high voltage.

On one hand, although the body of the claim recites a "stylus tip," this limitation does not expressly rely on the preamble, which recites merely "[a] stylus comprising."

On the other hand, dependent Claims 4 and 5 rely on the preamble of Claim 1 for antecedent basis (emphasis added):

4. The stylus of claim 1, wherein the high-voltage signals identify a location of *the stylus* relative to the touch sensor of the device.

5. The stylus of claim 1, wherein, when *the stylus* is in contact with or in the proximity of the touch sensor of the device, the high-voltage signals are used to simulate or distinguish:
contact by an object other than *the stylus* with the device; or
a presence of the object near the touch sensor of the device.

This explicit reliance on the preamble by the dependent claims, particularly when coupled with the reference to a "stylus tip" in the independent claim, warrants finding the preamble limiting. *See Pacing Techs.*, 778 F.3d at 1024 (preamble of independent claim found to be limiting because, among other factors, the preamble provided antecedent basis for a term in a dependent claim). Although *Pacing Technologies* did not set forth a bright-line rule regarding preambles that provide antecedent basis for dependent claims, this authority is noteworthy particularly when considering also the reference to "stylus tip" in the independent claim.

The Court therefore hereby finds that **the preamble of Claim 1 of the '866 Patent is limiting**.

10.  **"high voltage"**

| **"high voltage"** ('866 Patent, Claims 1, 15) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| "voltage in the range of approximately 10–20 volts" | Indefinite |

(Dkt. No. 58, Ex. A, at 7; Dkt. No. 92, App'x A, at 12.)

(a)  The Parties' Positions

Plaintiff argues that "the intrinsic evidence provides ample evidence of the scope of the term 'high voltage,' and thus it is not indefinite."  (Dkt. No. 76, at 22.)  Plaintiff submits that the specification "makes it clear what the bounds of 'high voltage' are: high as compared to 1–3 volts of a stylus in normal operation and specifically within the range of 10–20 volts."  (*Id.*)

Defendant responds that "high voltage" is a term of degree that lacks objective boundaries. (Dkt. No. 82, at 13.)  Defendant submits that even Plaintiff's expert has been unable to identify any boundaries for "high," and "[t]he need for clear notice of the claim scope is particularly pronounced in the '866 patent because the boundary between 'high voltage' and 'not high voltage' differentiates infringing styluses from those that do not infringe."  (*Id.*, at 14; *see id.*, at 15–18.) Defendant also argues that Plaintiff's interpretation is disfavored because it would render dependent Claim 3 superfluous.  (*Id.*, at 15; *see id.*, at 18–20.)  Moreover, Defendant argues that "Wacom's proposed claim construction is improper because it seeks to narrow the claim meaning to one embodiment in the specification, and contradicts guidance in the prosecution history regarding the scope of high voltage."  (*Id.*, at 15; *see id.*, at 20–23.)  For example, Defendant argues:

- 30 -

Even if high voltage is determined in relation to the reference voltage, the construction Wacom seeks shows a remarkably broad range. Stating that "high voltage" is 10-20 volts when compared to a reference of 1-3 volts means that the ratio could be anywhere from 20:1 (20 volts vs. 1 volt) to 3.33:1 (10 volts to 3 volts), both of which are above the prosecution history's reference of "at least roughly three times." But if these ratios were applied to the opposite ends of the exemplar ranges, they would yield "high voltage" amounts ranging from 3.33 volts to 60 volts.

(*Id.*, at 22.)

Plaintiff replies that "[t]he specification and indeed the claims themselves provide *explicit* guidance as to what is meant by 'high voltage.'" (Dkt. No. 86, at 4–5.) Plaintiff also argues that "Maxeye's claim that the term's meaning would change depending on the accused system, Dkt. 82 at 15–16, misses the mark, as high voltage is dependent on the context of the *technology at issue*, not the accused device." (Dkt. No. 86, at 6.)

At the January 28, 2026 hearing, Plaintiff acknowledged that "high" is used here as a term of degree, and Plaintiff maintained that its proposed construction is supported by intrinsic evidence.

(b)  Analysis

Claim 1 of the '866 Patent recites (emphasis added):

1. A stylus comprising:
    one or more electrodes;
    one or more computer-readable non-transitory storage media embodying logic for transmitting signals wirelessly to a device through a touch sensor of the device, at least some of the signals comprising *high-voltage* signals associated with a *high voltage* comprising a relatively large potential difference compared to a voltage within a voltage range of approximately 1 to approximately 3 volts;
    a component operable to convert the voltage of approximately 1 to 3 volts to the *high voltage*; and
    a stylus tip, one or more of the one or more electrodes being disposed at the stylus tip;
    wherein the *high-voltage* signals result from the one or more electrodes receiving the *high voltage*.

The Federal Circuit has "rejected the proposition that claims involving terms of degree are inherently indefinite," *Sonix*, 844 F.3d at 1377, and the definiteness standard of *Nautilus* does not require mathematical precision. *See Niazi Licensing Corp. v. St. Jude Med. S.C.*, 30 F.4th 1339, 1347 (Fed. Cir. 2022) ("While there must be objective boundaries, we have explained that a patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement. . . . Indeed, patentees often use descriptive words . . . to avoid a strict numerical boundary to the specified parameter.") (citations and internal quotation marks omitted); *see also Sonix*, 844 F.3d at 1378–79.

Nonetheless, "[t]he claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (citations omitted)).

Plaintiff cites prosecution history in which the patent examiner rejected "high voltage," stating:

> Claim 1 recites "high-voltage signals generated at least in part by a high voltage", which is vague. What is high voltage? How large is the high voltage? A high voltage comprising a relatively large potential difference compared to a voltage within a voltage range of approximately 1 to 3 volts, [i]s not clear how large is a large? Therefore, the high voltage is not clear.

(Dkt. No. 76, Ex. L, Aug. 15, 2016 Office Action, at 2 (WACOM-0001682).)  In response, the patentee cited the below-reproduced portion of the specification ('866 Patent at 11:43–65).  (*Id.*, Ex. M, Nov. 15, 2016 Response Under 37 C.F.R. § 1.111, at 6–7 (WACOM-10001696–97).) Plaintiff argues that because the examiner ultimately allowed the claims to issue with a "high voltage" limitation, the term is not indefinite.  Any such inference, however, is already accounted for by the presumption of validity.  *See* 35 U.S.C. § 282; *see also Sonix*, 844 F.3d at 1377

("Indefiniteness must be proven by clear and convincing evidence.").  The prosecution history cited by Plaintiff therefore does not significantly affect the Court's claim construction analysis.

Next, Plaintiff's expert opines that this term is not indefinite, stating that Defendant takes the term out of context of the full limitation and that Defendant "ignores the context of the claim in general, which concerns a 'stylus,' in which voltage needs would be considerably different, say, from the voltage needs of high-transmission power lines."  (Dkt. No. 76, Ex. H, Oct. 21, 2025 Nettles Decl. ¶ 54.)  Plaintiff's expert also cites the following paragraph of the specification as "provid[ing] a definition of 'high voltage' that makes it clear what is claimed" (*id.*):

> In particular embodiments, an active stylus may have one or more components, such as a transformer or charge pump, capable of producing substantially high voltage. Herein, *high voltage* indicates a relatively large potential difference compared to voltages used by an active stylus in normal operation, whether the relatively large potential difference is positive or negative. As an example, an active stylus produces voltage of approximately 1-3 volts while in normal operation. An electrical circuit of the active stylus contains a transformer capable of converting ordinary-operation voltage to high voltage in the range of 10-20 volts, for example approximately 12 volts. In particular embodiments, the high voltage produced by an active stylus is used to power components of the active stylus, such as one or more electrodes. As an example, a tip of an active stylus may have a substrate on which one or more electrodes are placed. High voltage may be delivered to the one or more electrodes. The one or more electrodes may transmit high-voltage signals to a device, such as a touch-sensitive device. As an example, FIGS. 6A and 6B illustrate one or more electrodes in tip 26 of active stylus 20 transmitting high voltage signals that communicate the stylus's relative location or movement to touch-sensitive device 52.

'866 Patent at 11:43–65 (emphasis added).

Contrary to the opinion of Plaintiff's expert, no "definition" is apparent.  Rather, this disclosure uses phrases such as "[i]n particular embodiments," "an example" and "for example."

Also, dependent Claim 3 of the '866 Patent, which depends from above-reproduced Claim 1, recites:

> 3.  The stylus of claim 1, wherein the high voltage comprises a voltage within the voltage range of approximately 10 to approximately 20 volts.

"[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315 (citation omitted); *see Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("Claim differentiation, while often argued to be controlling when it does not apply, is clearly applicable when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, and that limitation is the only meaningful difference between the two claims."). At the January 28, 2026 hearing, Plaintiff argued that even if dependent Claim 3 does not add any limitation, it does not necessarily follow that the independent claim is indefinite. Plaintiff may be correct, but, regardless, the presence of dependent Claim 3 weighs against Plaintiff's proposal of construing the "high voltage" in Claim 1 as meaning "voltage in the range of approximately 10–20 volts." *Id.*

Further, Plaintiff's expert has testified: "High voltage here is relative to the -- to the system that we're talking about. It's not some absolute number." Dkt. No. 82, Ex. 1, Nov. 18, 2025 Nettles dep. at 79:13–15. Defendant does not propose that the patent must define "high voltage" as a specific numerical range to avoid indefiniteness, and, as a general matter, "a sound claim construction need not always purge every shred of ambiguity," and "[t]he resolution of some line-drawing problems . . . is properly left to the trier of fact." *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) (citing *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998); *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) (citing *PPG*, 156 F.3d at 1355; citing *Acumed*, 483 F.3d at 806).

Here, however, Plaintiff proposes a specific numerical construction that would render a dependent claim superfluous, and Plaintiff's expert has testified that to apply the term "high voltage" he would need to "understand the accused system to understand what's [with]in scope."

(Dkt. No. 82, Ex. 1, Nov. 18, 2025 Nettles dep. at 75:3–7 (emphasis added); *see, e.g., id.* at 78:6–9 ("[T]he reason for the high voltage had to do with certain characteristics of interacting with the tablet.  And my guess is that 5 volts would not be high enough voltage, but I don't know that for certain").)  Thus, whether a voltage is "high" appears to be an inquiry focused on the accused instrumentality.  Particularly when considering that the independent claims specifically recite what the "high voltage" is "high" in relation to (namely "approximately 1 to approximately 3 volts"), the testimony of Plaintiff's expert demonstrates that the claim recites "high voltage" in a manner that is "'purely subjective' and depends 'on the unpredictable vagaries of any one person's opinion.'"  *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018) (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350–51 (Fed. Cir. 2005)).  To be clear, the testimony of Plaintiff's expert does not itself give rise to indefiniteness.  Rather, the testimony of Plaintiff's expert merely confirms that a person of ordinary skill in the art would not understand the claim's usage of "high voltage" with reasonable certainty.

Moreover, although the prosecution history cited by Plaintiff does not significantly affect the Court's claim construction analysis, as noted above, Defendant cites an earlier statement by the patentee that further reinforces that the "high voltage" limitation in this patent is not reasonably clear.  Specifically, when citing a portion of the above-reproduced disclosure ('866 Patent at 11:45–54) in response to an indefiniteness rejection, the patentee stated that "one of ordinary skill in the art would understand that the claims' recitation of 'relatively large potential difference compared to a voltage within a voltage range of approximately 1 to approximately 3 volts' refers to voltages that are *at least roughly three times* the comparison voltage."  (Dkt. No. 82, Ex. 2, Dec. 14, 2025 Response Under 37 C.F.R. 1.111, at 6–7.)  The patentee's reference to "at least roughly three times the comparison voltage" adds to the confusion because the cited examples of

"10–20 volts" and "12 volts" (*see* '866 Patent at 11:45–54) bear no clear relation to the "three times" multiplier set forth by the patentee (other than merely being greater than three times 3 volts). In light of this, as well as in the absence of any explicit lexicography (particularly when considering the patentee's use of the word "roughly"), this prosecution history reinforces that the "high voltage" limitation does not "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 134 S. Ct. at 2129.

Finally, Plaintiff cites decisions of other district courts as to "high voltage" terms, but those decisions are unpersuasive. First, "claims of unrelated patents must be construed separately." *See e.Digital Corp. v. Futurewei Techs., Inc.*, 772 F.3d 723, 727 (Fed. Cir. 2014). Second, for example, the *Dexcowin* case cited by Plaintiff rejected an indefiniteness challenge, but the court there found that "[t]he term is not unbounded because the high voltage supply must drive an x-ray tube," and the ultimate issue there (in the context of summary judgment) became "whether the voltage applied to the x-ray tube in each of the Accused Products is high enough to generate x-rays." *Dexcowin Global, Inc. v. Aribex, Inc.*, No. CV 16–143–GW(AGRx), 2017 WL 3477747, at *6 (C.D. Cal. June 1, 2017) (Wu, J.). Other decisions cited by Plaintiff likewise are not controlling here and are unpersuasive. *See Lucas Aerospace, Ltd. v. Unison Indus., L.P.*, 890 F. Supp. 329, 334–35 (D. Del. 1995) (Scwartz, J.) ("high DC output voltage"); *see also Microchip Tech., Inc. v. Aptiv Servs. US, LLC*, 1:23-CV-00778-JDW, 2024 WL 3444616, at *5–*7 (D. Del. July 15, 2024) (Wolson, J.) ("large gm value"; "high bandwidth"; "low gain").

The Court therefore hereby finds that "high voltage" is **indefinite**.

**11.  "a component operable to convert the voltage of approximately 1 to 3 volts to the high voltage"**

| "a component operable to convert the voltage of approximately 1 to 3 volts to the high voltage"<br>('866 Patent, Claims 1, 15) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Not a means-plus-function limitation.<br><br>However, if the Court construes as a means-plus-function limitation, then the function and corresponding structure is:<br><br>Function:<br>    "convert the voltage of approximately 1 to 3 volts to the high voltage"<br><br>Structure:<br>    "a transformer or charge pump, and equivalents thereof" | Function:<br>    "convert the voltage of approximately 1 to 3 volts to the high voltage"<br><br>Structure:<br>    "a transformer or charge pump" |

(Dkt. No. 58, Ex. A, at 7–8; Dkt. No. 92, App'x A, at 13–14.)

(a)  The Parties' Positions

Plaintiff argues that Defendant cannot overcome the presumption against means-plus-function treatment for this non-means term.  (Dkt. No. 76, at 23.)  Plaintiff also argues that "'component' in the claim refers to an electronic component," and "[a]n electronic component is a known term referring to a definite structure . . . ."  (*Id.* (citation omitted).)  Plaintiff concludes that "a person of ordinary skill in the art would have understood 'a component operable to convert the voltage of approximately 1 to 3 volts to the high voltage' to be referring to a voltage converter in one of a small number of known forms, and so denotes sufficient structure."  (*Id.*, at 24.)

Defendant responds that "component" is a nonce word that does not connote sufficiently definite structure, and "merely specifying that the claimed 'component' is an 'electronic

- 37 -

component' still fails to connote sufficiently definite structure." (Dkt. No. 82, at 24–25.) Defendant also emphasizes that "it is insufficient to merely state that a person skilled in the art would know of structures to fulfill the claimed function—the proper inquiry is whether the claim limitation connotes sufficiently definite structure." (*Id.*, at 26.)

Plaintiff replies that "[i]n the context of the '866 patent, the word component is not a 'nonce word,' but rather refers to *electronic* components that have a known structure," and Plaintiff emphasizes that the "component" here at issue is hardware, not software. (Dkt. No. 86, at 7.) Plaintiff also argues that "voltage converters were a specific set of structures known in the art at the time of the invention," and "it does not matter how many structures are denoted, so long as a POSITA would understand that a structure is known." (*Id.*, at 8 & 9 (citation omitted).)

At the January 28, 2026 hearing, the parties reiterated the arguments set forth in their briefing. Regarding the corresponding structure if the Court finds that this is a means-plus-function term, Defendant agreed with Plaintiff that the corresponding structure should include "equivalents thereof."

(b)  Analysis

Title 35 U.S.C. § 112, ¶ 6 (now known as § 112(f)) provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

"In exchange for using this form of claiming, the patent specification must disclose with sufficient particularity the corresponding structure for performing the claimed function and clearly

link that structure to the function." *Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1378 (Fed. Cir. 2014).

"[T]he failure to use the word 'means' . . . creates a rebuttable presumption . . . that § 112, para. 6 does not apply." *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (citations and internal quotation marks omitted). "When a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1349 (citations and internal quotation marks omitted).

*Williamson*, in an *en banc* portion of the decision, abrogated prior statements that the absence of the word "means" gives rise to a "strong" presumption against means-plus-function treatment. *Id.* (citation omitted). *Williamson* also abrogated prior statements that this presumption "is not readily overcome" and that this presumption cannot be overcome "without a showing that the limitation essentially is devoid of anything that can be construed as structure." *Id.* (citations omitted). Instead, *Williamson* found, "[h]enceforth, we will apply the presumption as we have done prior to *Lighting World* . . . ." *Id.* (citing *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004)).

Here, Claim 1 of the '866 Patent recites (emphasis added):

1. A stylus comprising:
   one or more electrodes;
   one or more computer-readable non-transitory storage media embodying logic for transmitting signals wirelessly to a device through a touch sensor of the device, at least some of the signals comprising high-voltage signals associated with a high voltage comprising a relatively large potential difference compared to a voltage within a voltage range of approximately 1 to approximately 3 volts;
   *a component operable to convert the voltage of approximately 1 to 3 volts to the high voltage;* and

- 39 -

a stylus tip, one or more of the one or more electrodes being disposed at the stylus tip;

wherein the high-voltage signals result from the one or more electrodes receiving the high voltage.

The absence of the word "means" gives rise to a presumption against means-plus-function treatment. *Williamson*, 792 F.3d at 1349. Also, "the mere fact that the disputed limitations incorporate functional language does not automatically convert the words into means for performing such functions." *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018) (citation omitted).

Nonetheless, Plaintiff does not persuasively demonstrate that "component" refers to any known class of structures. Plaintiff cites a technical dictionary definition of "component" as meaning: "A device or part used in a circuit to obtain some desired electrical action [e.g., a resistor (passive component) or an integrated circuit (active component)]." Dkt. No. 76, Ex. K, *The Illustrated Dictionary of Electronics* 135–36 (8th ed. 2001). Regarding this, Plaintiff's expert opines that:

> A POSITA would have understood, in the context of the claims and specification, that "component" in the claim refers to an electronic component, and is not a nonce word. An electronic component is a known term referring to a definite structure— for example the Illustrated Dictionary of Electronics, Eighth Edition published in 2001 (WACOM-0016173-982) defines component as "[a] device or part used in a circuit to obtain some desired electrical action [e.g., a resistor (passive component) or an integrated circuit (active component)]." *See id.* at 135-136. The claims further describe that the "component" is "operable to convert the voltage of approximately 1 to 3 vol[t]s to the high voltage." In other words, the component is a voltage converter, which is a specific type of structure known to POSITAs at the time of the invention. Indeed, at the time of the invention (i.e., the 2011 time period), there were many known voltage converter designs. Such designs include those identified in the specification such as a transformer or charge pump, but would also include other designs, as one of ordinary skill in the art would have recognized, such as flyback converters, inductors, etc. See, for example, the 2006 Texas Instruments paper "DC-DC Power Conversions and System Design Considerations for Battery Operated System" (WACOM-0016983-7000), which discusses "five commonly used DC-DC conversion topologies suitable for battery operated systems: Buck, Boost, non-inverting Buck-Boost, Charge Pump and Flyback converters," and the

> relative advantages and disadvantages of each of these voltage converter designs.
> Thus, by the time of the '866 invention in 2011, a POSITA would have understood
> "a component operable to convert the voltage of approximately 1 to 3 volts to the
> high voltage" to be referring to a voltage converter in one of the well-known forms.

(Dkt. No. 76, Ex. H, Oct. 21, 2025 Nettles Decl. ¶ 56.)  As in the *Diebold* case cited by Defendant, however, Plaintiff's expert "d[oes] little more than opine that a skilled artisan would understand the functional term [at issue] to be any structure capable of performing the claimed function." *Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1301 (Fed. Cir. 2018).  Moreover, the recital of "a component operable to [perform a function]" resembles the "format" of a "traditional means-plus-function limitation." *Williamson*, 792 F.3d at 1349.  Finally, this term is not analogous to the *Apex* case cited by Plaintiff, which found that a different word, "circuit," connoted structure in the relevant art (when used "with an appropriate identifier").  *Apex Inc. v. Raritan Comput., Inc.*, 325 F.3d 1364, 1373 (Fed. Cir. 2003).  Plaintiff's reliance on the "height adjustment mechanism" in *Flo Healthcare* is likewise unpersuasive.  *Flo Healthcare Sols., LLC v. Kappos*, 697 F.3d 1367, 1374–75 (Fed. Cir. 2012) (finding that "height adjustment mechanism" designates "a class of structures that are generally understood to persons of skill in the art").  On balance, the disputed "component" term "recites function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1350.

As for the claimed function and the corresponding structure, the parties essentially agree.  Plaintiff's proposal that the corresponding structure should include "and equivalents thereof" comports with 35 U.S.C. § 112(f).

The Court therefore hereby finds that "a component operable to convert the voltage of approximately 1 to 3 volts to the high voltage" is a **means-plus-function term**, that the claimed function is **"convert the voltage of approximately 1 to 3 volts to the high voltage,"** and that the corresponding structure is **"a transformer or charge pump, and equivalents thereof."**

- 41 -

## IX.  DISPUTED TERMS IN U.S. PATENT NO. 10,768,720

### 12.  "An electronic pen, comprising:"

| **"An electronic pen, comprising:"** ('720 Patent, Claim 1) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| The preamble is a limitation of the claim. | The preamble is not limiting. |

(Dkt. No. 58, Ex. A, at 8; Dkt. No. 92, App'x A, at 15.)

(a)  The Parties' Positions

Plaintiff argues that "[a]ll of the embodiments described in the patent are directed to the structure of and componentry within an 'electronic pen,'" and "[t]he pen is the structural component that ties all of the other components together in a single structure."  (Dkt. No. 76, at 25 (citation omitted).)

Defendant responds that preambles are generally not limiting and that, here, the body of the claim is structurally complete such that the preamble adds nothing to the configuration of the claimed device.  (Dkt. No. 82, at 27–29.)  Defendant argues that an "electronic pen" was well known in the art and is not referenced in the body for antecedent basis, which distinguishes the preamble of Claim 1 of the '356 Patent that the parties have agreed is limiting.  (*Id.*, at 28–29.)

Plaintiff replies: "Maxeye also incorrectly focuses on whether the preambles recite 'a conventional use in the prior art.'  Dkt. 82, at 28.  The issue here is not the intended use of the inventions, but whether the preambles recite necessary structure."  (Dkt. No. 86, at 10.)

At the January 28, 2026 hearing, Plaintiff argued that the preamble is essential for understanding the relationships between components recited in the body of the claim.  Defendant responded that the body of the claim recites a complete invention.

<u>(b)  Analysis</u>

Claim 1 of the '720 Patent recites (emphasis added):

1.  *An electronic pen, comprising:*
    a tubular chassis;
    a core body disposed on an end side of the tubular chassis in an axial center direction;
    a writing pressure detector configured to detect a pressure applied to the core body;
    a circuit board including a flexible substrate and a longitudinal length extending in the axial center direction, wherein the circuit board is in the tubular chassis, the circuit board comprising:
        a writing pressure detector placement part, at least a portion of the writing pressure detector located on and coupled to the writing pressure detector part;
        a circuit placement part, a predetermined circuit formed on the flexible substrate at the circuit placement part; and
        a line part arranged between the writing pressure detector placement part and the circuit placement part in the axial center direction, a conductive line pattern formed at the line part that electrically couples the writing pressure detector and the predetermined circuit of the circuit placement part; and
        a holder housed in the tubular chassis in such a manner as to hold the writing pressure detector and the circuit board and extend in the axial center direction,
        wherein the circuit placement part of the circuit board is held by the holder, and wherein the writing pressure detector placement part of the circuit board is configured in such a manner that, through bending of the flexible substrate at a part of the line part, the writing pressure detector placement part is held by the holder in a direction perpendicular to the axial center direction, and the writing pressure detector is allowed to receive a pressure in the axial center direction applied to the core body.

Much like for Claim 1 of the '220 Patent, nothing in the body of the claim recites an electronic pen, and the body of the claim explicitly recites "a tubular chassis," "a core body," "a writing pressure detector," and "a circuit board" without any apparent reliance on the preamble. The limitations in the body of the claim can be readily understood without necessarily being limited to an electronic pen.  The specification disclosures cited by Plaintiff do not demonstrate otherwise.  (Dkt. No. 76, at 25 (citing '720 Patent at 1:7–10; citing *id.* at 2:21–31 (Brief Summary

section stating "the present disclosure provides an electronic pen that reduces manufacturing steps including an electrical connection between a writing pressure detector and a writing pressure detecting circuit"); citing *id.* at 4:20–29:4 (Plaintiff asserts that "[a]ll of the embodiments described in the patent are directed to the structure of and componentry within an 'electronic pen,'" Dkt. No. 76 at 25)); *see Phillips*, 415 F.3d at 1323 ("we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment") (citation omitted).)  The preamble recital of an "electronic pen" is an intended use, not a limitation.  *See Pitney Bowes*, 182 F.3d at 1305 (quoted above); *see, e.g., Georgetown Rail*, 867 F.3d at 1236 (citing *Allen Eng'g*, 299 F.3d at 1346).

The Court therefore hereby finds that **the preamble of Claim 1 of the '720 Patent is not limiting**.

## X.  CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patent-in-suit.  The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

## So Ordered this
### Feb 3, 2026

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE